**John M. PETROWSKI, Grace Ringle, a minor, by Ervin Ringle, her guardian ad litem, Francis Gelhar, Ruth Petrowski, and Herlene Gelhar, a minor, by Herbert Terwilliger, her guardian ad litem, Plaintiffs,**

v.

**HAWKEYE–SECURITY INSURANCE COMPANY, a corporation, Defendant.**

Civ. No. 2498.

United States District Court, W. D. Wisconsin.

Oct. 11, 1954.

Smith, Okoneski, Puchner & Tinkham, E. P. Gorman, Donald D. Keberle, Herbert Terwilliger, Wausau, Wis., for plaintiffs.

Victor M. Harding and John G. Vergeront (of Whyte, Hirschboeck & Minahan), Milwaukee, Wis., for defendant.

STONE, District Judge.

This action having come on for trial before the court without a jury, Smith, Okoneski, Puchner & Tinkham, E. P. Gorman, Donald D. Keberle and Herbert Terwilliger, appearing for the plaintiffs, and Victor M. Harding and John G. Vergeront appearing for the defendant, and the court having considered all of the evidence presented and the briefs submitted by counsel for the parties hereto, now makes the following

### Findings of Fact.

1. That the defendant is now and was at all times mentioned in the complaint, an insurance company engaged in writing automobile liability insurance, having its home office at Des Moines, Iowa.

2. That on May 7, 1951, Francis Meehan of Harpers Ferry, Iowa, who was then in the Armed Forces stationed at Chanute Field, Illinois, was the owner of a 1940 Chevrolet automobile. On said date he applied to his uncle, Cyril Wiedner, of Waukon, Iowa, a licensed and authorized insurance agent and representative of the defendant, for an automobile insurance policy covering his Chevrolet. He informed Wiedner of his intention to use the car at Chanute Field, an Air Force Base, near Rantoul, Illinois, where he was then stationed. Wiedner informed Meehan that the policy would have to contain a restriction that the insurance did not apply when the car was being operated by any other member of the Armed Forces without Meehan being in the car when it was being so operated. At that time Meehan signed a statement which accompanied his application which read as follows:

"I understand and agree that the insurance on my car is not in force when driven by any other member of the Armed Forces unless I am also in the car."

Defendant then issued its Automobile Liability Insurance Policy No. A–33603, dated May 14, 1951, effective May 7, 1951, to Francis Meehan as the named insured, covering the operation of Meehan's Chevrolet automobile, with limits of $50,000 for bodily injury for each accident, $25,000 for each person, $5,000 for property damage and $1,000 for medical payments for each person.

3. After the policy was issued it was delivered to Francis Meehan with the Declarations and Policy Provisions and a Special Restrictive Endorsement marked Exhibit 3 herein which stated:

"It is agreed that such insurance as is afforded by this policy shall be of no force or effect while the de-

scribed automobile is being operated by any member of the Armed Forces other than (1) the Named Insured, or (2) a member of the Armed Forces who is a member of the Named Insured's immediate family."

4. In issuing the policy and before delivery to Meehan, the defendant's agent Wiedner countersigned the Policy Declarations, but did not countersign the endorsement, Exhibit 3, that accompanied the Declarations, although there was a space for his signature. The endorsement provided as follows:

"This endorsement when countersigned by a duly authorized agent of the Company and attached to Policy No. A–33603, issued to Francis Meehan, shall be valid and form a part of said policy."

This endorsement was never signed by Wiedner or any authorized agent of the defendant.

5. On July 9, 1951, Francis Meehan and Francis R. Gelhar, both Corporals in the Armed Forces stationed at Chanute Field, Illinois, engaged as instructors in Jet Engines, jointly purchased a 1949 Pontiac automobile at Rantoul, Illinois. They agreed to and did pay in equal shares, the purchase price of the car, the cost of the insurance policy here involved, the cost of registration and of its maintenance. The Chevrolet was traded in as a part of the purchase price and Meehan was paid one-half the trade-in value by Gelhar. Francis R. Gelhar was not related to Meehan and not a member of his immediate family.

6. On July 11, 1951, after the purchase and delivery of the Pontiac to Meehan and Gelhar, Meehan wrote his uncle, Cyril Wiedner, defendant's agent, that he and Gelhar had jointly purchased the Pontiac and requested that the insurance liability policy issued on the Chevrolet be transferred to the Pontiac and that Gelhar, the part-owner, be covered by the policy. Wiedner received this letter, Exhibit 19, on July 13, 1951. After receipt of this letter, Wiedner, by letter dated July 14, 1951, advised the defendant to change the coverage on the policy from the Chevrolet to the Pontiac and the transfer of the policy was made by defendant.

7. While the defense contends that on receipt of Meehan's letter by Wiedner advising him of the joint ownership of the Pontiac he immediately wrote Meehan that if Gelhar was to have an interest in the Pontiac, the policy should be sent back for cancellation and insurance should be secured from someone at Chanute Field, Wiedner was unable to produce the original or copy of his alleged letter to Meehan, but did offer a reconstructed version of what he recalled the letter contained. Meehan's testimony, as well as Wiedner's, as to this alleged communication was conflicting, unreliable and very unsatisfactory, and the court finds that no such communication was had between Meehan and Wiedner at that time. The policy was not returned for cancellation and no further inquiry or demand for its return was made on Meehan by Wiedner or the defendant. Defendant never offered or made a refund to Meehan for the premium paid.

8. In September, 1951, Gelhar, with the express permission and consent of Meehan, drove the Pontiac to his home in Marathon County, Wisconsin, where he was spending his furlough, and while operating said car on Highway 29 near Wausau, Wisconsin, it collided with another auto then being operated by one John M. Petrowski, one of the plaintiffs herein. As a result of said collision the occupants of both cars sustained severe and permanent injuries. At the time of the collision Meehan was not in the car.

9. In actions commenced in the Circuit Court for Marathon County, Wisconsin, by the occupants of the cars involved in the collision against Francis Gelhar for damages for the injuries they sustained, judgments were rendered against Francis Gelhar and in favor of the following named plaintiffs, in the

amounts set opposite their names, as follows:

John Petrowski ........ $19,249.37
Grace Ringle, a minor .. $ 3,829.10
General Casualty Com.
pany of America ..... $ 1,346.32
Herlene Gelhar and
Frances Callies ...... $ 8,694.24
Ruth Petrowski ....... $12,500.00

10. That prior to the commencement of this action said Ervin Ringle assigned his interest and share in said judgment to the said Grace Ringle, and the said General Casualty Company of America assigned its interest and share in said judgment to the said John Petrowski.

11. No part of said judgments has been paid by Francis Gelhar or by the defendant Hawkeye-Security Insurance Company, although payment has been duly demanded.

12. That Ronald Keberle of Wausau, Wisconsin, was retained by Francis Gelhar, as his attorney to represent him in his defense against the claims of the above named judgment creditors for damages they sustained as a result of said collision. That Keberle did represent Gelhar as his attorney and defended him against the claims of said claimants. That the services performed by Keberle for Gelhar as aforesaid were necessary and required by Gelhar in that the defendant had refused to defend Gelhar in said actions, following a tender of the defense in all of said actions by Gelhar to the defendant. That the bill for services and disbursements rendered by Keberle to Gelhar as aforesaid itemized and set forth in Exhibit 21 herein, is reasonable and proper and the disbursements included therein were actually incurred on behalf of Francis Gelhar by Keberle and were necessary to the defense of said actions. That the defendant is indebted to Francis Gelhar in the sum of $2,490.22 as set out in said Exhibit 21, and Francis Gelhar is entitled to judgment against defendant for said sum of $2,490.22 and costs.

13. On November 24, 1950, defendant filed the resolution and power of attorney (Exhibit 7) with the Commissioner of Motor Vehicles of the State of Wisconsin. That the power of attorney reads in part as follows:

"The Hawkeye-Security Insurance Co. hereby applies to have its (safety) (financial) responsibility notices of insurance recognized as evidence of insurance of nonregistrants in Wisconsin.

"That the governing executive authority has duly adopted a resolution providing that its policies are *varied to comply* with the laws of this state relating to the terms of motor vehicle liability policies issued therein under 85.09 of the Wisconsin Statutes.

"The insurer hereby appoints the Commissioner of Motor Vehicles for the State of Wisconsin as its Attorney in fact to accept service of notice or process on its behalf and for its insured in any action or proceedings arising out of a motor vehicle accident in Wisconsin occurring (prior) (subsequent) to the date hereof and agrees that such service shall be legal and binding upon the insurer and this appointment shall remain in force and not be revoked in respect of actions or proceedings arising out of motor vehicle accidents in Wisconsin occurring prior to the date of revocation.

"The insurer hereby undertakes to appear in any action or proceedings described in the foregoing power of which it has knowledge.

"The insurer hereby agrees to accept as final and binding any final judgment duly rendered in any action arising out of a motor vehicle accident in any court of competent jurisdiction in this state."

14. That by filing said resolution and power of attorney, defendant agreed that its auto policies should comply with and be governed by all the applicable Statutes of Wisconsin relating to auto insurance policies, in the event the auto it insured became involved in an accident in Wisconsin, and defendant is

now estopped to deny that the said Wisconsin Statutes governing and controlling the terms and conditions of auto liability insurance policies became a part of the policy involved herein as to the automobile accident in question.

15. That the defendant's policy referred to herein was amended when issued so as to comply with all of the said Wisconsin Statutes.

16. That the service of the process in this action upon the Commissioner of Motor Vehicles for Wisconsin, pursuant to said power of attorney, was valid and this court has jurisdiction over the defendants.

17. That all of the conditions precedent to the establishment of liability on the part of the defendant under the terms of said policy have been complied with by Francis Gelhar and Francis Meehan and all of the plaintiffs in this action.

18. That the Department of Insurance of Iowa after an investigation proceedings as to the restrictive endorsement as evidenced by Exhibit 3, which reads in part as follows:

"That the insurance afforded by this policy shall be of no force or effect while the automobile is being operated by any member of the Armed Forces"

found that this type of an endorsement was contrary to public policy and not in the public interest, and on January 22, 1952, issued a promulgation and order, Exhibit 6 herein, which has been in force and effect since said date. That said order is in fact a recognition by the Insurance Commission of Iowa of the public policy of that State concerning restrictive endorsements such as Exhibit 3, and the declarations and determinations by said Commissioner contained in Exhibits 5 and 6, set forth herein, are accurate statements of the public policy of the State of Iowa not only as to respective dates of their issuance, but of the public policy of Iowa from March through November 1951, and were in recognition of the prior and continuing public policy and public interest of the State of Iowa as to this type of restrictive endorsement.

The material part of Exhibit 5 reads as follows:

"Certain automobile-liability endorsements have been submitted to this Department for approval, which limit policy coverage to the named owner and the immediate members of his family, such as in the case of a student driver, a member of the armed forces, of an assigned risk, or other endorsements of a similar character, and;

"Whereas, such endorsements tend to defeat the purpose of the Financial Responsibility Act, are discriminatory, and are otherwise against the public interest;

"It Is, Therefore, Ordered that no further endorsements of this type will be approved for filing with this Department after date of this Bulletin, and that all such endorsements already on file will stand disapproved on and after December 1, 1951. A Hearing will be held in the offices of the Insurance Commissioner in Des Moines, Iowa, on Tuesday, November 27, 1951, at 2:00 o'clock p. m., at which time and place all companies and persons affected by this Order will be given full opportunity to be heard in the premises.

"
" Charles R. Fischer
"Commissioner of Insurance"

The material part of Exhibit 6 reads as follows:

"Pursuant to prior notice, a hearing was held at 2:00 p. m. Jan. 10, 1952, before the Insurance Commissioner of the State of Iowa, relative to the Commissioner's 'Bulletin F–2' relating to certain restrictive automobile liability endorsements.

"Various members of the insurance industry were present, including a Committee representing 25 companies whose names appear in a formal Brief and Argument filed with the Commissioner at the time

of the hearing. It was announced by the Commissioner that, if any person present so desired, a reporter would be provided to preserve a formal record of oral evidence and arguments. In the absence of such a request, no formal record of oral evidence and arguments was preserved.

"After hearing all evidence and arguments presented at said hearing, and having reviewed and considered the formal Brief and Argument on file herein, the following conclusions have been reached:

"The Brief filed herein reports the results of an accident study on 1,100,000 passenger cars. It discloses that the cars driven in whole or part by the age group under 25 had 64.6% of the accidents reported. It is estimated by objectors that the age group under 25 constitutes about 15% of licensed drivers. Assuming these figures to be substantially correct, it becomes immediately obvious that the incident of accidents by military personnel should be exceptionally high, not because of occupation, but because of age group. The report of the Iowa Department of Public Safety indicates that the age group under 25 years were involved in 29% of the reported accidents last year. The only comparative figures set out in objector's Brief relative to service men is from the report of the Iowa Department of Public Safety, which demonstrated that drivers in military service, although constituting but one-half of 1% of the drivers reporting accidents, were responsible for 1.4% of the total reported deaths. Recognizing that these figures are meager and inconclusive, yet it will be noted that this experience is substantially in ratio to the frequency of accidents for the civilian age group under twenty-five years.

"Statistical information filed with the Department fails to demonstrate the need for eliminating students and service men as classes from automobile liability policies, or to limit the scope of their coverage. To do so would be unfairly discriminatory.

"The courts have held many times that the insurance business is impressed with a public interest, and we are firmly convinced that those who choose to engage in this business must recognize the public's reasonable needs for established coverages as well as the generally accepted interpretation thereof. Virtually all automobile insurers write a standard form of liability policy with standard coverages as a matter of choice. These coverages have become so standardized that the public no longer questions the scope of coverage of one company's policy as against another. For a company to attach a restrictive endorsement to a policy merely because a member of the family is a student or may be of military age is a form of deception that should not be permitted.

"Likewise, it is the general concept of automobile liability insurance that it follows the car and not the insured. Such endorsements, if generally used, would be in contravention to this concept and would, therefore, tend to deceive the policyholder and the public in general. They would, therefore, be against public policy.

"If experience demonstrates that there is an increased occupational hazard in the case of students and military personnel, the Statutes provide the framework for properly rating the increased exposure of these classes, Such an approach to the problem would meet the public need for appropriate liability protection and at the same time afford the companies an adequate rate for their increased exposure.

"The language of 'Bulletin F–2' would indicate that its provisions were intended to apply to all restric-

tive endorsements attached to automobile liability policies. However, the Bulletin was intended to apply only to endorsements *generally used* pertaining to students, service men or others as a class, as distinguished from the isolated case in which the peculiar circumstances might make a restrictive endorsement necessary. To this extent 'Bulletin F–2' may be considered to be modified.

"It is therefore now ordered that 'Bulletin F–2' of Nov. 9, 1951, as modfied, shall be in full force and effect on and after Feb. 15, 1952.

"Dated Jan. 22, 1952

"Charles R. Fischer
"Commissioner of Insurance
"State of Iowa".

■ 19. That the special endorsement, Exhibit 3, was not countersigned by an authorized agent, required by its terms, as a precedent to its validity, and was invalid for that reason. It is also invalid because it is contrary to the public policy and public interest of the States of Iowa and Wisconsin, and was never at any time in force or effect. It was never submitted to the Commissioner of Insurance of Iowa as required by Statute, I.C.A. § 321A.1 et seq., and its use by defendant was contrary to the law of Iowa and it was therefore invalid.

20. The policy defines "insured" in part as follows:

"With respect to the insurance for bodily injury, liability and property damage liability, the unqualified word 'insured' includes the named insured and also any person while using the automobile, provided the actual use of the automobile is by the named insured or with his permission."

■ 21. That at the time of said accident Francis Gelhar was operating said Pontiac auto with the knowledge and express permission and consent of Francis Meehan, the named insured, and was an "additional insured" within the terms of said policy and the applicable statutes of Wisconsin and Iowa and was therefore covered under the provisions of said policy.

Conclusions of Law.

1. That this court has jurisdiction over the defendant and the subject matter of this action.

2. That the plaintiffs, John M. Petrowski, Grace Ringle, a minor, by Ervin Ringle, her guardian ad litem, Francis Gelhar, Ruth Petrowski, and Herlene Gelhar, a minor, by Herbert Terwilliger, her guardian ad litem, are entitled to judgment in their favor and against the defendant as prayed for in the amended complaint herein, together with interest upon their respective judgments from the date of entry thereof, with their costs and disbursements.

■ 3. That Francis Gelhar is entitled to judgment against the defendant in the sum of $2,490.22, with costs and disbursements.

Let judgment be entered accordingly.